THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
ROGER A. ARKEBAUER, Defendant-Appellee.

Fifth District   No. 5—89—0077

Opinion filed June 5, 1990.

Michael Kiley, State's Attorney, of Shelbyville (Kenneth R. Boyle, Stephen E. Norris, and Ellen Eder Irish, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Michael B. Metnick, D. Peter Wise, Diana N. Cherry, and Richard D. Frazier, all of Metnick & Barewin, of Springfield, for appellee.

PRESIDING JUSTICE LEWIS delivered the opinion of the court:

The State appeals from an order suppressing the defendant's, Roger A. Arkebauer's, statements. In issue is whether the circuit court's determination that the defendant's statements were involuntary because the statements were induced by the promise of immunity was against the manifest weight of the evidence.

■ Before considering the propriety of the circuit court's suppression of the defendant's statements, we must first address the defendant's motion to strike portions of the State's brief which was raised in the defendant's brief. The defendant contends that portions of the State's statement of facts must be stricken from its brief as the facts contained on numerous pages therein are from documents not properly of record, *i.e.*, facts that were obtained from the grand jury transcript, from police reports, and from transcripts of tape recordings of court-authorized overhears. We decline to grant the defendant's motion as the material was properly included in the record on appeal; however, we will not rely upon this evidence in our determination of the issue presented. *People v. Brackett* (1986), 144 Ill. App. 3d 442, 494 N.E.2d 610.

In this case, the defendant was promised on January 15, 1988, that he would not be prosecuted for the offenses of solicitation to commit murder (Ill. Rev. Stat. 1987, ch. 38, par. 8—1(a)) and conspiracy to commit murder (Ill. Rev. Stat. 1987, ch. 38, par. 8—2(a)) by the assistant State's Attorney for Macon County and by the Illinois State Police, if he would cooperate in the investigation of Raymond Ruhl's plot to murder his wife. Subsequently, on April 12, 1988, a bill of indictment for these offenses was returned against the defendant in Shelby County. The defendant filed a motion to suppress several statements

given to the Illinois State Police and the Macon County assistant State's Attorney as a result of his agreement with the Macon County assistant State's Attorney, which was granted by the circuit court. It is from this order of the court that the State appeals.

At the hearing on the motion to suppress the defendant's statements, the Honorable Jerry Patton, circuit judge for the Sixth Judicial Circuit, testified that on January 15, 1988, at about 2:30 p.m., it came to his attention by way of a telephone call from either Jack Ahola or Gerry Sheehy, that an order for an eavesdrop was needed. Sometime later, Judge Patton met with Officer McClearen, Jack Ahola, the defendant, and possibly Officer Bensyl and Gerry Sheehy. At this meeting, the judge was presented with two complaints, one for a search warrant of Raymond Ruhl's residence and one for a court-authorized eavesdrop. Judge Patton inquired as to why the wiretap was brought in Macon County as the earlier wiretap had been brought in Champaign County, and the judge was told that time was of the essence for the eavesdrop and that the defendant worked in Decatur, Macon County, Illinois. The defendant was introduced to the judge, and the judge inquired of the defendant as to whether he understood his consent to the eavesdrop to which the defendant responded affirmatively. Neither the judge nor anyone in the judge's presence discussed granting immunity to the defendant at this time. The judge admitted that he had no knowledge of any statements that were made to the defendant outside of his presence. As a result of the defendant's and Officer McClearen's statements, Judge Patton issued a search warrant and an order for an eavesdrop.

Jack Ahola testified that he was the assistant State's Attorney in charge of the criminal division for Macon County, Illinois. According to Ahola, at about 7 a.m. on January 15, 1988, he met with Agents McClearen and Bensyl in his office to discuss this case. The agents were aware that the defendant was a pivotal figure in a proposed murder plot, and the decision was made that the defendant should be brought in and asked to give information which would enable the agents to arrest Raymond Ruhl. At this meeting, Ahola and the agents discussed making a deal with the defendant wherein he would not prosecute the defendant, if the defendant cooperated. The details of the agreement with the defendant were not discussed among the three of them, but Ahola stated that it was thought that the defendant could provide information to obtain an eavesdrop order, a search warrant and an arrest warrant.

After the meeting, the agents left Ahola's office and went to Caterpillar Tractor Company to pick up the defendant. The agents

brought the defendant back to Ahola's office at approximately 9 a.m. Ahola told the defendant that if the defendant cooperated, "we" would not prosecute him, and the defendant agreed to help. Ahola denied that he promised the defendant immunity, and he stated that he specifically never discussed transactional immunity with the defendant.

Ahola informed the defendant that they were investigating Raymond Ruhl and Ruhl's attempts to have his wife murdered. Ahola did not advise the defendant of his *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and he told the defendant that they were not trying to prosecute him. The defendant talked with Ahola for a couple of hours, during which the defendant related facts regarding the contemplated murder plot of Mrs. Ruhl. After Ahola's discussion with the defendant, he accompanied the defendant to Judge Patton's chambers where, with the help of the defendant, Ahola obtained a search warrant and an eavesdrop order. While in Judge Patton's presence, immunity was not discussed with the defendant by him or by anyone else. Neither was the promise not to prosecute the defendant discussed before the judge.

After going before the judge, the defendant participated in the eavesdrop by calling Ruhl from the State's Attorney's office. According to Ahola, the defendant gave them much information and cooperated. Ahola stated that the defendant had done everything expected of him with the exception that it was understood that the defendant would testify against Ruhl at some future date. However, Ahola expected the defendant's cooperation to run for some months in the future as there was no expectation that Ruhl would die, and Ahola's promise not to prosecute was to last throughout the prosecution of Raymond Ruhl. Ahola explained that the investigation of Ruhl encompassed events which had occurred in four separate counties, Shelby County, Christian County, Champaign County, and Macon County.

When Ahola discussed his promise not to prosecute with the defendant, Ahola did not tell the defendant that he would be immunized in Macon or any other county. Additionally, Ahola did not tell the defendant that their discussion only applied to Macon County. Ahola could not recall if the defendant was present when he and Agent Bensyl discussed which county the charges against Ruhl would be filed. Ahola admitted that he could not say with absolute certainty that the term "immunity" was not used in his discussion with the defendant.

Sometime after January 15, 1988, but before the defendant was indicted in Shelby County, Guy Casey, an attorney, indicated to Ahola that he represented the defendant. Ahola advised Casey that he had agreed not to prosecute the defendant as long as the defendant cooper-

ated and told the truth. Casey asked Ahola if formal immunity had been granted to the defendant, and Ahola denied that this was done. Ahola explained that for formal immunity to be granted, he would have to present a motion for immunity to the court and an order would have to be entered.

On cross-examination, Ahola testified that he assumed that Ruhl would be prosecuted in Macon County at the time he talked to the defendant. Ahola admitted that even though there were different counties involved, it was still the same police agency involved in the investigation. Ahola did not tell the defendant, after Ruhl's death, that his promise to the defendant had ended. Ahola stated that he had no further conversation with the defendant after January 15, 1988. Ahola acknowledged that the indictments brought against the defendant in Shelby County were substantially the same charges for which Ahola had promised the defendant he would not be prosecuted.

David McClearen testified that he was an agent with the Department of the State Police in the Division of Criminal Investigation (DCI). He had received information that Raymond Ruhl was attempting to hire a person to kill his wife, and as a result of his investigation of Ruhl, McClearen had contact with the defendant. McClearen, accompanied by Agent Lee Bensyl, first saw the defendant on January 15, 1988, at the security office at the Caterpillar Tractor Company in Decatur. Prior to the meeting with the defendant that day, McClearen and Bensyl had met with Gerry Sheehy, an investigator for the State's Attorney's office, and with Jack Ahola, at the State's Attorney's office, to discuss the subsequent meeting with the defendant. McClearen did not recall the word "immunity" being used during the discussion with Sheehy and Ahola, but he did recall that Ahola agreed not to prosecute the defendant in Macon County in exchange for the defendant's cooperation. It was McClearen's understanding that the defendant's cooperation was to include his helping with the arrest of Ruhl, his telling everything he knew about Ruhl's plot, and his 100% cooperation with them.

McClearen met with the defendant about 9 or 10 a.m. on the morning of January 15, 1988. At the beginning of their meeting, the defendant was first advised of his *Miranda* warnings and was told about their investigation of Ruhl. In addition, the defendant was told that he was not under arrest, and that the assistant State's Attorney had offered not to prosecute the defendant if he agreed to cooperate with them in their investigation. The defendant agreed to talk with the officers, but because the security office did not provide an adequate place to talk, McClearen asked the defendant to come down to the State's

Attorney's office.

Upon their arrival at the State's Attorney's office, the defendant was introduced to Jack Ahola. Before any discussions were initiated, the agents drew Ahola aside and told Ahola what had been discussed at the Caterpillar security office, and the agents asked Ahola if he would like to talk to the defendant. According to McClearen, Ahola talked to the defendant for a lengthy interval, during which McClearen was in and out of the room. McClearen testified that he did not hear any conversation regarding immunity between Ahola and the defendant, but that he did hear Ahola tell the defendant that he would agree not to prosecute the defendant in return for the the defendant's cooperation, i.e., the defendant would do anything they asked. At no time during the discussion was mention made of other counties.

McClearen stated that he was present during the meeting with Judge Patton and during the defendant's telephone call to Ruhl for the eavesdrop. McClearen corroborated Ahola's testimony that the defendant helped to obtain a search warrant and an eavesdrop order. McClearen also stated that no discussion of immunity for the defendant was held in Judge Patton's presence. While McClearen met with Judge Patton, Agent Bensyl contacted the Shelby County State's Attorney's office. Subsequent to the eavesdropped conversation between the defendant and Ruhl, a meeting was held in which the officers discussed their plan to arrest Ruhl.

After the defendant had gone before the judge, and after he had participated in the eavesdrop, McClearen told the defendant that it would be best if the defendant did not return to his home on the chance that Ruhl would try to contact him there. The defendant told McClearen that he was going to a movie and that he would then go to his cabin on Lake Pana.

McClearen testified that he was satisfied with the defendant's performance of his tasks. However, McClearen was concerned that the defendant had "tipped Ruhl off" about Ruhl's pending arrest after their meeting on January 15, 1988. McClearen admitted that a thorough investigation and a polygraph examination administered to the defendant regarding whether the defendant had advised Ruhl of the pending arrest revealed that there was no evidence that the defendant had done so. In McClearen's opinion, the defendant had only told them of his limited involvement with Ruhl, and that later the police discovered that the defendant's involvement was more extensive than the defendant had revealed. However, McClearen admitted that the defendant had told the officers that it was he who had approached Bennett to inquire about a "hit man" for Ruhl, that the defendant had

given Bennett a photograph and information about Ruhl's wife, that it was the defendant who told Bennett that no payment would be made until the job was done, that Bennett told the defendant the price of the job, and that the defendant told Ruhl that he had found a person to kill Ruhl's wife. McClearen testified that he never talked to the defendant again after January 15, 1988.

McClearen was briefly recalled to testify during the defendant's case in chief. At that time, McClearen could not recall telling Agent Erlenbush that the defendant was granted immunity, but he did recall telling Erlenbush that the defendant was not going to be charged. McClearen stated that at the time he was interviewed by Erlenbush, he was in the hospital with wounds to his head, hand, and his wrist from the shooting of January 15, 1988, and that he was on medication.

Jack Eckerty, a sergeant with the Illinois State Police, DCI, testified that he investigated the shooting of January 15, 1988. (At this time, we note for clarification that during this shooting, which occurred during the course of the State Police's attempt to arrest Ruhl, Raymond Ruhl was killed as was Agent Lee Bensyl.) In the course of his investigation, he interviewed the defendant at the Pana police department at approximately 12:40 a.m. on January 16, 1988. Agent Erlenbush was also present at the interview. Eckerty advised the defendant of his rights before he questioned the defendant, and the defendant agreed to talk to him. The purpose of Eckerty's questioning of the defendant was to determine if the defendant had talked to Ruhl after the defendant's meeting with the assistant State's Attorney and the police on January 15, 1988.

At the beginning of the defendant's interview, the defendant told Eckerty that he had been promised immunity by the State's Attorney in Macon County. Neither Eckerty nor Agent Erlenbush told the defendant that he had not been given immunity, nor did Eckerty attempt to discover whether the defendant had been given immunity as the defendant said. After questioning the defendant as to whether the defendant had talked to Ruhl after the meeting of January 15, 1988, Eckerty was satisfied that the defendant had not alerted Ruhl to the pending arrest.

Fred Paoletti testified that he was a polygraph examiner employed by the Illinois State Police and that on January 16, 1988, at about 4 a.m., he interviewed the defendant. His interview with the defendant centered on whether the defendant had warned Ruhl of the pending arrest. At no time during his conversation with the defendant did he discuss the events prior to January 15, 1988, or the meeting in the State's Attorney's office on January 15, 1988. The defendant did not

tell him anything regarding promises that were made, and Paoletti was unaware of any grant of immunity or of promises not to prosecute given to the defendant. The defendant freely answered the questions asked by Paoletti, and the defendant denied that he falsified or concealed information regarding the case.

Michael Mannix testified that he was a special agent with the Illinois State Police in the Division of Internal Investigation (DII). Mannix stated that he first interviewed the defendant at his home on February 3, 1988. Mannix was accompanied at this interview by Agent Erlenbush. Prior to the interview, Agent Erlenbush advised the defendant of his *Miranda* warnings, the defendant was told that they were investigating a possible conspiracy, and the defendant agreed to answer their questions. Before any questions were asked, the defendant informed Mannix that he had immunity in Macon County. According to Mannix, Agent Erlenbush responded to the defendant's statement of immunity by saying that "that had to do with Macon County, we were here on a different investigation." The interview proceeded and lasted approximately two to three hours. Mannix stated that neither he nor Agent Erlenbush promised the defendant immunity or offered the defendant other inducements for his statements.

Mannix interviewed the defendant a second time on February 9, 1988, at the defendant's home, and Mannix was again accompanied by Agent Erlenbush. The defendant was advised of his rights prior to the interview, and the defendant agreed to talk. The defendant was told that this interview was a follow-up to the interview of February 3, 1988. Mannix did not recall that the defendant stated anything about immunity at this interview, and likewise, neither of the agents promised the defendant immunity or promised the defendant he would not be prosecuted.

Mannix admitted that at the time he interviewed the defendant on February 3, 1988, he was aware that a promise not to prosecute the defendant or immunity had been offered to the defendant, as Agent Erlenbush had advised him that he had heard that the defendant had been given immunity in Macon County prior to this interview. However, Mannix did not discuss this matter with the State's Attorney. Mannix was unaware that the defendant's part of the agreement was that he was to cooperate with the law enforcement officers. Mannix admitted that the defendant cooperated with them, and the defendant told them he had had numerous conversations with Ruhl. Mannix further admitted that anytime they (the State Police) interviewed anybody, they always advised the person of their rights, and that, at the defendant's interview, either he or Agent Erlenbush told the defend-

ant that informing the defendant of his rights was a matter of procedure or policy. Additionally, neither Mannix nor Erlenbush told the defendant that he was the subject of a grand jury investigation or that the defendant could no longer rely on Jack Ahola's agreement. Mannix stated that he attempted to interview the defendant on a third occasion at the defendant's place of employment.

Stuart Erlenbush testified that he was a master sergeant with the Illinois State Police assigned to DII. On January 16, 1988, after the shooting incident, he went to the Pana police department. He arrived at the police department at about midnight and interviewed the defendant at approximately 12:30 a.m. Agent Eckerty was also present at the interview. Eckerty advised the defendant of his rights, and the defendant agreed to talk. The defendant advised the agents that he had been granted immunity by Macon County, but Erlenbush did not confirm or inquire into whether this was so. Erlenbush asked the defendant what occurred after his meeting with the police on January 15, 1988, and the defendant told him that after leaving the agents, he went to a movie in Springfield and then to his cabin on Lake Pana. Erlenbush asked the defendant to submit to a polygraph examination, and the defendant agreed. During the interview, Erlenbush did not promise or offer inducements to the defendant for his statements.

During the late morning of January 16, 1988, Erlenbush interviewed Agent McClearen in the hospital. Erlenbush asked McClearen about the events of the previous day, including the events at the Macon County State's Attorney's office. At some point in the interview with McClearen, Erlenbush was advised that the defendant was granted immunity by the Macon County State's Attorney's office. Erlenbush recalled that McClearen used the term "immunity" in this discussion.

Erlenbush next saw the defendant at his home on February 3, 1988, with Agent Mannix. At the beginning of the interview, he gave the defendant his *Miranda* warnings, which prompted the defendant to state that he had been granted immunity in Macon County. Erlenbush had not talked to Jack Ahola at any time between January 16, 1988, until the time of this interview, to determine whether the defendant had immunity. Erlenbush told the defendant that they were not from the Macon County State's Attorney's office and that he was unaware of what arrangements the defendant had with Macon County. At the time of the interview of February 3, 1988, the grand jury had not convened.

Erlenbush, along with Agent Mannix, next interviewed the defendant on February 9, 1988, at which time Erlenbush again advised the

defendant of his rights. Erlenbush did not recall that the defendant said anything about immunity on this occasion. Erlenbush testified that he did not offer any inducement or make any promise to the defendant to obtain his statements at this interview or at any of the previous interviews. Erlenbush admitted that he did not tell the defendant at this interview, or at the interview of February 3, 1988, that he did not have immunity. Erlenbush further admitted that it was possible that the defendant was told at an interview that the administering of his rights was just routine procedure. Erlenbush also testified that the investigation of the murder plot against Ruhl's wife involved Champaign, Shelby, Christian and Macon Counties.

After the interview of February 9, 1988, Erlenbush and Mannix attempted to interview the defendant once again. Erlenbush advised the defendant of his rights, and the defendant refused to talk to the agents. The defendant explained that he had been to his bank, and that the bank told him that his records had been subpoenaed. Because of the subpoena, the defendant did not want to talk to the agents.

Guy Casey testified on behalf of the defendant. Casey stated that he first saw the defendant on March 17, 1988. At that time, the defendant told Casey that he was under the understanding that he had immunity from the Macon County State's Attorney's office. The defendant assumed that his subsequent conversations with the law enforcement officers were covered under the immunity from Macon County. The defendant told Casey that a subpoena had been issued by Shelby County and that he did not understand what was occurring since he thought he had immunity. The defendant asked Casey to inquire into this situation.

In response to the defendant's request, Casey met with Jack Ahola on one occasion and talked to Ahola twice on the telephone. At the meeting with Ahola, Ahola told Casey that he had promised the defendant immunity, but that he had not taken the defendant in front of a judge to obtain formal immunity. Casey suggested to Ahola that Ahola should formalize the immunity at this time; however, Ahola said he could not do so as Ruhl was dead and there was no case pending.

Casey testified that he had also talked to Erlenbush on March 30, 1988. According to Casey, Erlenbush told Casey that he had heard that the defendant had been given immunity.

Casey stated that the defendant always referred to the term "immunity" whenever the defendant discussed the situation with him. When Casey discussed immunity with Ahola, Ahola did not state that the immunity was restricted to Macon County. Casey acknowledged that there was not a court order granting the defendant immunity, and

that, at best, the defendant had received a promise of immunity.

The defendant testified in his own behalf. He stated that on January 15, 1988, he was summoned to the security chief's office at his place of employment, Caterpillar Tractor Company. At the security office, he met Agents Bensyl and McClearen, who identified themselves as agents of the Illinois State Police. The agents told the defendant they were aware of Ruhl's plan to have his wife killed, and that they knew that the defendant was involved in the plan. The agents advised the defendant of his rights and explained to the defendant that they were authorized to give him immunity if he were willing to cooperate in their investigation of Ruhl. The defendant asked them to explain this offer. According to the defendant, Agent Bensyl told him that they were authorized to make the defendant an offer that would let him walk away free, and that the defendant would not be arrested, prosecuted or have a criminal record. The defendant asked the agents for verification of this offer, whereupon the agents told the defendant they would take him to the State's Attorney's office, and the State's Attorney would elaborate.

When the defendant arrived at the State's Attorney's office, he was introduced to Jack Ahola. Ahola stated that he was authorized to offer the defendant immunity if the defendant would cooperate with the State Police, and if the defendant would tell them what he knew about Ruhl's plan. When Ahola made this offer, Ahola neither placed a geographic limit nor a time limitation on the offer. Ahola told the defendant that he would have to help obtain an arrest warrant and an eavesdrop order, and that the defendant would have to participate in the eavesdrop and would have to testify in court. The defendant asked Ahola if this was "full immunity," and Ahola responded that it was. The defendant accepted this agreement and talked to Ahola. A typed version of the defendant's statements was prepared for the defendant to sign, and armed with these statements, the defendant and Ahola went to the judge's chambers. The judge questioned Ahola and the defendant as to the truth of the defendant's statements, and both stated that the statements were true.

The defendant and Ahola returned to the State's Attorney's office and, upon his return, the agents prepared questions for the defendant to ask Ruhl during the eavesdrop. The defendant participated in the call, and afterwards, the agents said they were pleased with the results. While the defendant was still in their presence, the agents began planning the strategy of Ruhl's arrest. Before the defendant left the State's Attorney's office, one of the agents wrote their names and telephone numbers down and gave them to the defendant. The agents

told the defendant that he should call one of them late that night to find out if it was safe for the defendant to return to his home. Ahola asked the defendant not to go home, and the defendant told Ahola that he would go to a movie and then go to his lake home and stay the night, which he did.

At about midnight that night, law enforcement officers appeared at his cabin at the lake and took the defendant to the Pana police department. At this time, the defendant was told that the police were investigating the shootout. The defendant was given his rights, which the defendant questioned since he had been given immunity. Erlenbush told the defendant that they wanted to know what had happened after the defendant had left the State's Attorney's office, and the agents wanted to know if the defendant had informed Ruhl about his pending arrest. Erlenbush asked him if he would consent to take a polygraph examination, and the defendant consented. Again, prior to the administration of the polygraph examination, the defendant was given his rights. The defendant questioned again the necessity of being given his rights as he believed he had immunity.

The defendant confirmed that Agents Mannix and Erlenbush interviewed him on February 3, 1988. According to the defendant, the agents identified themselves and stated that they wanted to ask him more questions. The defendant explained that he believed he had to talk to the agents since Ahola had told him that he had to cooperate with the State Police under the terms of his grant of immunity, and that if he did not speak to the agents, he would jeopardize his immunity. The defendant stated that when Erlenbush advised him of his rights he felt apprehensive and that he asked Erlenbush why he was read his rights when he had an agreement. Erlenbush told the defendant that the reading of his rights was just a formality and a procedure, and that the signed waiver form verified that the agents had seen and had spoken to the defendant. The defendant was also told by Erlenbush that Erlenbush had not spoken with Ahola, but that other agents in the department had told him that the defendant had been given immunity. At the conclusion of the interview on February 3, 1988, Erlenbush told the defendant that he or other agents would be in contact with the defendant in the future.

The defendant could not recall the date of the next interview that he had with the agents, but he testified that, at this interview, Erlenbush again advised him of his rights. When the defendant commented on the reading of his rights, defendant was again told it was the agents' procedure and a formality and that the defendant ought to be familiar with this procedure by now. The defendant talked to the

agents at this interview as he believed that this was required under his agreement with Ahola.

The agents returned to talk to the defendant on yet another occasion, but this time the defendant refused to talk to them. The defendant explained that he had gone to his bank to obtain a loan which was refused because the bank was not interested in doing business with him due to a subpoena that had been issued for the defendant's bank records. The bank's attorney advised the defendant to talk to his attorney, which prompted the defendant to contact Guy Casey. Therefore, when the agents returned for another interview, the defendant mentioned to them that he had had problems at his bank and that he wanted to talk to his attorney. Erlenbush told the defendant that there was no arrest warrant against the defendant and that he knew of no prosecution pending against the defendant. The defendant told the agents that he wanted to cooperate; however, he was not comfortable doing so since the incident at the bank.

The defendant testified that had he known that his agreement was not in effect on January 16, 1988, and at the subsequent interviews with the agents, he would have asked to consult with his attorney. The defendant admitted that he did not ask Ahola if there were geographical limits to his agreement. The defendant also admitted that Erlenbush advised him that he had not talked to anyone at Macon County about the defendant's agreement, but that the defendant agreed to talk to the agents. However, Erlenbush also told the defendant on February 3, 1988, that if the defendant had immunity, then he had nothing to worry about.

Lastly, Michael Kiley, the Shelby County State's Attorney, testified that Agent Bensyl had contacted him on January 15, 1988, regarding the potential prosecution of Raymond Ruhl. As a result of his conversation with Agent Bensyl, Kiley wrote a letter to the Illinois State Police summarizing his conversation with Agent Bensyl. In the letter, Kiley stated that he and Agent Bensyl had briefly discussed an arrangement entered into by the Macon County State's Attorney's office in which a promise of a grant of immunity was given to an unknown individual whom Kiley subsequently knew to be the defendant. Kiley stated that it had been described to him that the defendant had been promised that he would not be prosecuted in Macon County, and Agent Bensyl asked Kiley if he would be interested in talking to the defendant about a similar arrangement in Shelby County.

After considering the foregoing evidence, the circuit court took the defendant's motion under consideration. Subsequently, the court entered an order on the docket sheet on December 22, 1988, in which the

court held that the defendant's motion to suppress all evidence of guilt induced under the governmental promise of immunity must be granted. The court found that the defendant had been promised he would not be prosecuted for his involvement with Raymond Ruhl if he cooperated with the investigation of Ruhl. The court determined that under this promise, the defendant believed he had been offered immunity from prosecution and that he was never advised that a promise not to prosecute was not the same as immunity or that the promise was only good in Macon County. The court found that the defendant had a reasonable belief that he had immunity and that he cooperated with the police in accord with that belief. Further, because the subject of the investigation remained the same at the subsequent interviews by the State Police, the assistant State's Attorney's promise also induced the defendant's statements given at these interviews. Therefore, the court held that the defendant's statements were inadmissible.

On appeal, the State argues that the defendant's statements were admissible as the statements were voluntarily made. In support of its assertion, the State raises four subissues, which are as follows: (1) that the defendant was not granted immunity, (2) that the promise not to prosecute the defendant given by the Macon County Assistant State's Attorney cannot be binding on the Shelby County State's Attorney, (3) that the defendant did not fulfill the obligation of his agreement to cooperate which vitiated the agreement, and (4) that the investigation in Shelby County was conducted by different authorities than in Macon County. While these subissues do come into our consideration of this appeal, the primary question to be determined is whether the defendant's statements were voluntarily made.

■■ ■ The basic tenet of the law is that in considering whether a statement is voluntary, the surrounding circumstances of the statement must be considered in their totality. (*People v. Overturf* (1979), 67 Ill. App. 3d 741, 385 N.E.2d 166.) While the failure to advise a defendant of his constitutional rights renders a statement *per se* involuntary, the converse, that the administering of a defendant's rights and a defendant's waiver of those rights makes the statement voluntary, is not true. (*Overturf*, 67 Ill. App. 3d 741, 385 N.E.2d 166.) Additionally, a statement is not voluntary where it was obtained by a governmental promise of immunity. (*Shotwell Manufacturing Co. v. United States* (1963), 371 U.S. 341, 9 L. Ed. 2d 357, 83 S. Ct. 448; *People v. Bogolowski* (1927), 326 Ill. 253, 157 N.E. 181.) A court's determination of the voluntariness of a defendant's statements will not be overturned on review unless it is contrary to the manifest weight of the evidence. *People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949; *People v. Tan-*

*ser* (1979), 75 Ill. App. 3d 482, 394 N.E.2d 616.

■ In this case, it is clear that while the defendant was not granted transactional immunity pursuant to statute (Ill. Rev. Stat. 1987, ch. 38, par. 106—1 *et seq.*) or use immunity, he was given a promise not to prosecute by both the Macon County assistant State's Attorney and by the agents of the Illinois State Police. This promise by the governmental authorities prompted not only his statements of January 15, 1988, but also his subsequent statements of January 16, 1988, February 3, 1988, and February 9, 1988. It was eminently reasonable for the defendant to believe that his agreement applied to his subsequent interviews, for there was a continuity of agents conducting the interviews, in that the agents were all with the Illinois State Police; the subject matter of the interviews related to the same ongoing investigation as the one covered by his agreement; and the defendant was never disabused of his belief that he would not be prosecuted by any of the agents at the interviews. Additionally, suffice it to say that this court has relied heavily upon the facts of this case in its determination, and, having already extensively set forth those facts, there is no need to further reiterate them at this juncture. Therefore, we find that the totality of the circumstances surrounding the defendant's statements in the case *sub judice* render the defendant's statements involuntary, and the circuit court's granting of the defendant's motion to suppress was not against the manifest weight of the evidence.

■ We note that while the State is correct that a State's Attorney of one county cannot bind another State's Attorney of another county with his promises, that problem does not arise here. The circuit court determined that the defendant could be prosecuted in Shelby County, and we find this a proper determination; however, because the defendant's statements were involuntary, the defendant's statements cannot be used in the Shelby County prosecution.

For the foregoing reasons, the judgment of the circuit court of Shelby County, granting the defendant's motion to suppress his statements, is affirmed.

Affirmed.

HARRISON and WELCH, JJ., concur.