2016 IL App (3d) 130861

Opinion filed February 22, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-13-0861 |
| v. | ) | Circuit No. 12-CF-1098 |
| | ) | |
| TERRANCE L. TUSON, | ) ) | Honorable Kevin Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Presiding Justice O'Brien and Justice Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Terrance L. Tuson, appeals from an order of the circuit court denying his motion to suppress statements he made during a police interview. He claims that his statements should have been suppressed because they were induced by a promise of immunity. We affirm.

¶ 2    In November 2012, defendant was indicted on charges of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2010)), attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)) for his involvement in the shooting death of Shannon Elmore and the attempted murder of Jemeral Linwood on October 10, 2011.

¶ 3    Prior to trial, defendant moved to suppress statements he made to investigators about the murder. In his motion, defendant argued that he was not properly informed of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and that any elicited statements violated an immunity agreement he had with the federal government.

¶ 4    At the hearing on the motion to suppress, federal agent Matthew Hoffman testified that he was a special agent with the Federal Bureau of Investigation in September of 2012 when he met defendant at the federal courthouse in Peoria. Defendant had just been sentenced to 90 months on federal firearm and drug trafficking charges and ordered to report at a later date. Defendant was sitting in the courtroom with his attorney, John Lonergan, and Assistant United States Attorney Tate Chambers. When Hoffman approached, Lonergan and Chambers informed him that defendant had a proffer agreement with the federal government and they believed he had information about a homicide in Peoria County. Hoffman then met with defendant and Lonergan in the hallway. During their conversation, defendant provided Hoffman with information about Elmore's murder. The specific details of the shooting were unclear, but defendant indicated that there was a plan and that he and another shooter hid in the bushes and waited for a man called "Jarel Lanew," later identified as Linwood. Both he and the shooter were carrying handguns. When Linwood arrived, shots were fired and Elmore was struck with a bullet. According to Hoffman, the conversation was informal and lasted only a few minutes.

¶ 5    The next day, Hoffman contacted Peoria County Detective Shawn Curry, the lead investigator in the Elmore murder, and informed him that defendant had information about the shooting. A few weeks later, Hoffman and Curry met defendant at a local park. Hoffman then drove defendant to the police station to discuss the shooting in more detail. Curry followed in a separate vehicle.

2

¶ 6        Hoffman testified that once they arrived at the station, he escorted defendant to an interview room. Curry entered the room and, in Hoffman's presence, read defendant his *Miranda* rights. After several preliminary questions, defendant asked Hoffman and Curry if the interview would hurt him. Curry responded that he needed to determine what happened. Hoffman agreed and said, "he's gotta get the full story just like you told me." Hoffman and Curry then left the room. Later, Curry returned and continued the interview without Hoffman. Curry then identified the videotape of the interview, which was admitted without objection.

¶ 7        The video shows Curry and Hoffman sitting at a table with defendant. Curry tells defendant that the State works differently than "fed stuff" and then reads defendant the *Miranda* warnings. Defendant indicates that he understands his rights and that he still wants to speak with Curry about the murder. Curry states that he is not interested in anything else; he is only interested in information about the Elmore murder. Defendant then asks, "[M]e being here won't hurt me, would it?" Curry responds by telling defendant that he has "to figure out what's going on." Hoffman adds that Curry needs to get "the full story just like you told me." Curry and Hoffman then exit the room. Several minutes later, Curry returns without Hoffman.

¶ 8        Curry testified that the entire interview lasted about 2 ½ hours. During that time, defendant never indicated that he did not want to speak with Curry, that he wanted an attorney or that he wanted to leave. Curry stated that he did not answer defendant's question about whether the interview would hurt him because he did not know what defendant was going to say.

¶ 9        At the end of the interview, Curry informed defendant that he was being charged with murder. Defendant responded that he could not be charged with murder because he was under a federal immunity agreement. Curry told defendant that he was not concerned about the federal agreement because he was investigating State charges.

3

¶ 10    Defendant's federal defense attorney, Lonergan, testified that he met with defendant and Hoffman in the hallway of the federal courthouse on September 20, 2012. Defendant spoke with Hoffman for about five minutes, and Lonergan was present for the entire conversation. Lonergan stated that prior to the hallway conversation, he only knew that defendant had information about a murder "and that was it." During the conversation, Lonergan realized that defendant was involved in the Elmore murder and had implicated himself as an accessory to the crime. Lonergan was unaware that Curry interviewed defendant a few weeks later.

¶ 11    Lonergan also testified that defendant executed a use immunity agreement with Chambers during the federal proceedings. Lonergan identified the agreement, and it was admitted as evidence in the case.

¶ 12    The agreement, dated March 9, 2011, states that defendant wishes to cooperate with the government on the condition that his statements are protected by a grant of use immunity. In addition, defendant agreed to the following:

> "You agree that you will not engage in any criminal activity of any kind, without the prior knowledge and approval of your supervising agents and this office. You agree that you will not engage in any use of any controlled substance.
>
> * * *
>
> *Any violation of any part of this agreement by you will void this agreement in its entirety and will release the United States from any obligation under this agreement.*" (Emphasis in original.)

Assistant United States Attorney Chambers signed the agreement. Under his signature is a paragraph which provides:

"I have read this letter entirely, and I understand and completely agree to the above terms. No promises have been made other than those stated in this letter regarding cooperation or immunity."

Defendant and Lonergan signed the agreement below this paragraph.

¶ 13     The trial court denied defendant's motion to suppress the statements made to Curry as involuntary. The court noted defendant's belief that he was under immunity but concluded that his belief was misplaced.

¶ 14     At defendant's jury trial, Kayla Brown testified that she was with Elmore and Linwood in Linwood's car on October 10, 2011. Linwood exited the vehicle and when he returned, someone started shooting at the car. Linwood jumped out and fired back. A stray bullet hit Elmore. After Linwood exited the car, Brown moved into the driver's seat and drove Elmore to the hospital. Brown spoke to investigators and identified the man who shot Elmore as Wesley Collins. She did not identify defendant as a shooter.

¶ 15     Curry testified about the interview he conducted with defendant on October 10, 2012. After he read defendant his *Miranda* warnings, defendant told Curry that he agreed to join Drummond, Wesley Collins and someone named "Boog" in an ambush. Drummond was mad because Linwood shot his friend's car. Drummond told defendant that he was going to kill some of Linwood's friends. Drummond, Collins and defendant went to the corner and hid in the bushes. They all had firearms. When Linwood exited the car, Drummond ran out of the bushes and started shooting. Defendant said that no one else left the bushes or shot a gun. After the shooting, defendant threw his gun away. Defendant admitted that he had been working for the federal government since April of 2011. He stated that he did not come forward with information about the shooting earlier because he knew that Drummond and Boog were "still

5

out" and he feared for his family's safety. Defendant also stated that Collins was his friend and that Drummond did not like him.

¶ 16    Curry told defendant that he believed his story, except that he believed Collins was the shooter. He thought defendant was lying about Drummond being the shooter because defendant was under the impression he had immunity. Defendant insisted that he was telling the truth, but Curry informed defendant that he had a letter defendant wrote to Collins that suggested otherwise.

¶ 17    Defendant testified on his own behalf. He admitted that he told Curry that Drummond shot Elmore but testified that he acquired the information from local gossip. He maintained that he did not have a gun that evening and that he did not see anyone else with a gun. He acknowledged that he told Curry he was involved in the shooting. After Curry informed him that he was being charged with murder, he did not tell Curry the truth because he thought the federal proffer would protect him even if he provided false information.

¶ 18    The jury found defendant guilty of all charges. The trial court sentenced him to consecutive terms of 45 years in prison for first degree murder and 25 years' for attempted first degree murder, followed by 3 years of mandatory supervised release.

¶ 19                                    ANALYSIS

¶ 20    Defendant contends that the trial court erred in denying his motion to suppress statements because he did not voluntarily waive his *Miranda* rights.

¶ 21    We review a trial court's ruling on a motion to suppress using a two-part standard of review. *People v. Luedemann,* 222 Ill. 2d 530, 542 (2006). A trial court's findings of fact are reviewed for clear error and will only be reversed if they are against the manifest weight of the

6

evidence.  *Id.*  The court's ultimate legal ruling as to whether suppression is warranted is reviewed *de novo.  Id.*

¶ 22      Prior to police questioning, a person must be warned that he or she has the right to remain silent, that any statement that person makes may be used as evidence against him or her, and that he or she has the right to the presence of an attorney.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Unless these warnings are given and the accused voluntarily, knowingly and intelligently waives these rights, the defendant's response should be suppressed.  *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990).  A waiver must be a knowing and intelligent act, committed with sufficient awareness of the resulting circumstances and consequences.  *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003).  A voluntary, knowing and intelligent waiver is determined by the facts and circumstances surrounding a particular case, including the background, experience and conduct of the accused.  *Id*. at 515.  A statement is not voluntary where it is obtained by a governmental promise of immunity.  See *People v. Arkebauer*, 198 Ill. App. 3d 470, 483-84 (1990) (defendant's statement is protected by promise of immunity unless he is "disabused of his belief" that he cannot be prosecuted for the crime).

¶ 23      In this case, Curry read defendant his *Miranda* warnings, and defendant implicated himself in the murder without invoking his right against self-incrimination.  Defendant asserts that he did not voluntarily waive his fifth amendment rights because he believed that his federal immunity agreement protected him from prosecution when he gave his statement to Curry.  However, any belief that defendant may have had that the federal use immunity agreement protected him against state murder charges was unreasonable because his conduct clearly violated the terms of the federal proffer.

7

¶ 24      It is true that defendant was the subject of a federal use immunity agreement when he participated in the crime that resulted in Elmore's murder. However, the terms of that federal agreement specifically stated that immunity would no longer apply if defendant participated in "any criminal activity of any kind without authorization." Murder and attempted murder qualify as prohibited criminal activities, and the record does not show that any federal agent or United States Attorney authorized defendant's participation in those illegal activities. At the suppression hearing, defendant did not claim that his participation in the plan to ambush Linwood had been authorized by the federal government or another legal authority. Defendant signed the immunity agreement and acknowledged its terms. Any belief he had that he was immune from prosecution when he gave his statement to Curry was not reasonable under the circumstances. Thus, the trial court did not err in denying defendant's motion to suppress and allowing his statement to be admitted at trial.

¶ 25      Defendant claims that his statement was involuntary because he was never "disabused" of his belief that he was protected by the immunity agreement. He cites *Arkebauer* and *People v. Stapinski,* 2015 IL 118278, ¶ 55, for support. We find both cases inapposite.

¶ 26      In *Arkebauer,* the Macon County assistant State's Attorney and agents of the Illinois State Police promised the defendant that he would not be prosecuted for conspiracy to commit murder if he would cooperate in the investigation of his employer's plot to murder his wife. The defendant relied on that promise and provided several statements during subsequent interviews which led to both the employer and the defendant being charged with solicitation to commit murder and conspiracy to commit murder in Shelby County. The appellate court concluded that the defendant's statements were involuntary and therefore inadmissible. The court found that it was reasonable for the defendant to believe that the immunity agreement applied to his

8

subsequent interviews because (1) all of the agents who executed the agreement and conducted the interviews were state agents, (2) the subject matter of the interviews related to the subject matter covered by the agreement, and (3) the defendant was never "disabused of his belief that he would not be prosecuted." *Arkebauer,* 198 Ill. App. 3d at 484.

¶ 27        In *Stapinski*, the our supreme court found that the trial court did not abuse its discretion in dismissing an indictment charging defendant with possession of a controlled substance where defendant was promised by investigators that he would not be charged if he cooperated in the apprehension of two co-defendants. The promise, however, was not authorized by the State's Attorney's office. The supreme court held that although the promise made by the officers was unauthorized, the indictment was properly dismissed because the defendant relied on the nonprosecution statement to his detriment and incriminated himself in the process. *Stapinski*, 2015 IL 118278, ¶ 55.

¶ 28        The facts in this case are distinguishable from both cases. Here, there was no continuity of agents. Defendant relied on a promise made by federal agents in making a statement to a Peoria County investigator. Unlike the state police investigators in *Arkebauer*, federal agent Hoffman left the room after defendant was read his *Miranda* rights; he was not part of the interview that lead to defendant's arrest for murder. Moreover, the subject matter of the Curry interview was not related to the subject matter of defendant's federal use immunity agreement. There is no indication in the record that federal agents told defendant he would not be prosecuted for any acted related to the Illinois murder. Nothing in the use immunity agreement relates to the facts surrounding the Elmore murder. Further, unlike the situations in *Arkebauer* and *Stapinski*, defendant signed the federal use immunity agreement and was sentenced in the federal case long before he participated in the criminal plan which resulted in Elmore's fatal shooting. His belief

9

that he was immune from prosecution for committing a state felony based on a federal use immunity agreement he signed six months earlier is unrealistic. Defendant cannot receive protection for committing a state crime that was unauthorized, unlawful and unrelated to the federal agreement. Defendant's statement was not protected by the use immunity agreement, and the trial court properly denied his request to suppress it.

¶ 29                                    CONCLUSION

¶ 30        The judgment of the circuit court of Peoria County is affirmed.

¶ 31        Affirmed.