SECOND DIVISION
December 11, 2007

No. 1-06-0432

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CARNELL MOORE, | ) | |
| | ) | Honorable |
| | ) | Stuart Palmer, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE KARNEZIS delivered the opinion of the court:

Defendant was tried and convicted by a jury of first degree murder for his role in the beating death of James McDonald on May 20, 2002. Defendant was sentenced to 35 years' imprisonment. On appeal, defendant argues that the trial court erred when it denied his motion to suppress and he was denied his sixth amendment right to confrontation.

Prior to trial, defendant filed a motion to quash arrest and suppress evidence. The trial court denied the motion.

Michael McDonald, James McDonald's brother, testified at trial that at the time of the incident he was living with his mother and brother in his mother's house at 5327 West Crystal in Chicago. Nearly everyday for two weeks before the incident, defendant came to their house looking for James because James owed defendant money. At about 7 p.m. on the evening of May 20, 2002, defendant came to the house looking for James and brought a two-by-four piece of construction wood with him. When Michael went into the alley at approximately 8:30 p.m., on that evening, he saw James lying in a pool of blood. An ambulance was called and James was taken to the hospital where he later died of his injuries.

At approximately 4:30 a.m., on the morning of May 21, 2002, Michael and his brother-in-law went into the alley where James was found and saw a two-by-four nearby that appeared to have blood on it. They called the police to collect it. Michael later identified defendant in a police lineup.

Frederick White, Michael McDonald's brother-in-law, corroborated Michael's testimony regarding the two-by-four in the alley. After he and Michael called the police to collect the board, Frederick got into his car, which was parked in the alley. While he was sitting in his car in the alley, he saw defendant bend over, grab the two-by-four and run away with it. Frederick identified defendant in a police lineup and in open court as the man he had seen remove the two-by-four from the alley.

2

Angela Taylor testified that she was James's neighbor. On Friday in the third week of May 2002, Taylor saw defendant walking in the alley behind James's house carrying a two-by-four. She had known defendant for about five years. He asked Taylor if she had seen James. Later that day when she came back outside, she saw James lying on the ground badly injured. When Taylor saw defendant the next day, he cried and told her that he had hit James with a stick and that he had died but he did not mean to do it.

Detective Kurt Hagemann testified that at approximately 2:30 a.m., on May 21, 2002, he and his partner went to defendant's house at 1118 North Latrobe in Chicago. While they were there, they heard a loud noise upstairs. Detective Hagemann ran outside and saw a black male fleeing from a second-story window. Defendant was later arrested by Lieutenant Leo Schmitz on the evening of May 21, 2002.

Detective Raymond Schalk testified that during an interview with defendant after his arrest, defendant told him that he had been looking for James McDonald because James owed him money. Defendant's wife, Latasha Tolliver, went with him to look for James. When defendant found James, James pulled out a large kitchen knife and the two began wrestling. Defendant picked up a two-by-four that was lying in the alley and hit James twice with it. Defendant and his wife then left the scene taking James's knife with him. They returned later for the two-by-four. Detective Schalk then told defendant that he had spoken with defendant's wife and that there were discrepancies in their stories. Defendant then told Detective Schalk that James did not actually have a knife and that he and his wife had made up that part of the story.

Later that evening, defendant was questioned by Assistant State's Attorney Denise Ambroziak in the presence of Detective Schalk. During that questioning, defendant stated that James owed him $50 for crack cocaine and that he had brought a two-by-four when he went looking for James in order to scare him. When he found James, defendant asked him for the $50. James became belligerent and defendant raised the two-by-four as though he would hit James. James attacked him and the two wrestled on the ground, where James hit his head on the pavement. Defendant hit him with the board several times, punched him and kicked him. Defendant fled the scene and left the board in the alley. He and his wife later returned to retrieve the board.

After this interview, defendant gave a videotaped statement consistent with the information he provided during the interview with Detective Schalk and Assistant State's Attorney Ambroziak. The videotaped statement was admitted into evidence and presented to the jury.

Dr. Te An, the medical examiner who performed James's autopsy, was not available to testify at trial because he had retired. Dr. Michael Humilier testified regarding Dr. An's report. Dr. Humilier testified that Dr. An had concluded that the cause of death was blunt force trauma and the manner of death was homicide. Dr. Humilier agreed with Dr. An regarding the cause and manner of death.

Defendant testified at trial. He stated that James had stolen some tools from him the day before the incident. He went to James's house several times on May 20, 2002, to retrieve the tools. He did not bring a two-by-four with him. Defendant then described the altercation with James, which was largely consistent with the one he

4

described in the videotaped statement. He did stress that James was exhibiting "crazy" behavior. Defendant testified that he did not bring the board with him, that he never went back to retrieve a board, that James never had a knife, and that when he left, James was conscious. He further stated that he made inconsistent statements in his videotaped statement because the police threatened to charge his wife if he did not change his story.

After hearing all of the evidence, the jury found defendant guilty of first degree murder. It is from this conviction that defendant now appeals.

Defendant first argues that the trial court erred in denying his motion to quash arrest and suppress evidence because he was illegally detained without probable cause when Lieutenant Schmitz ordered him into a police car for interrogation despite the fact that Lieutenant Schmitz was unaware of any specific facts connecting defendant to the beating death of James McDonald.

At the motion to suppress, Lieutenant Schmitz testified that he was working as a sergeant in the Area 5 Detective Division on May 21, 2002. Lieutenant Schmitz testified that he knew the detectives in his division were investigating a beating death that occurred the previous evening. After interviewing the victim's family members, the detectives had identified the perpetrator as Carnell Moore, who lived at 1118 N. Latrobe in Chicago. Lieutenant Schmitz further testified that he was aware that detectives had attempted to locate defendant at his home, but when they arrived a man jumped out of a second-story window and fled.

Lieutenant Schmitz stated that at approximately 7 p.m. on May 21, 2002, he received a telephone call wherein the caller stated that defendant was sitting in a red Oldsmobile near the corner of Augusta Boulevard and Kostner Avenue. Lieutenant Schmitz drove to that intersection with three other patrol cars. There, Lieutenant Schmitz saw a red Oldsmobile parked. One squad car parked in front of the Oldsmobile and another parked behind it. Lieutenant Schmitz approached the red car, identified himself and ordered defendant and his wife to exit the vehicle. Defendant's wife had been sitting in the driver's seat and defendant was in the passenger seat. Defendant identified himself as Carnell Moore. Lieutenant Schmitz searched defendant and ordered him into the backseat of his squad car. Once in the squad car, Lieutenant Schmitz read defendant his *Miranda* rights and told defendant that he wanted to interview him "about something that happened last night." Defendant told Lieutenant Schmitz that he had been in a fight the previous night with James McDonald and that he picked up a board lying in the alley and hit James in the head with it after James threatened him with a knife. Defendant was then arrested and handcuffed.

After hearing all of the evidence, the trial court denied defendant's motion stating that the police had sufficient knowledge to justify a *Terry* stop and that defendant was not in custody when he entered the police car. Accordingly, the arrest was legal and no evidence would be excluded.

When reviewing a trial court's decision regarding a motion to quash arrest and suppress evidence, we must accord great deference to the trial court's factual findings and credibility assessments and will reverse those findings only if they are against the

6

manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078 (2001). However, we review *de novo* the ultimate finding with respect to probable cause or reasonable suspicion. *Sorenson,* 196 Ill. 2d at 431, 752 N.E.2d 1078.

The State argues that Lieutenant Schmitz had, at least, an articulable suspicion to stop defendant. We agree.

In appropriate circumstances, a police officer may approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880 (1968). A police officer may stop a person for temporary questioning if the officer has knowledge of "sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed or is about to commit a crime." *People v. Lee*, 214 Ill. 2d 476, 487, 828 N.E.2d 237 (2005). During a *Terry* stop, an officer may ask the person or persons that have been stopped to identify themselves. *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 185, 159 L. Ed. 2d 292, 302, 124 S. Ct. 2451, 2458 (2004).

During the course of an investigatory stop, a person is " 'no more free to leave than if he were placed under a full arrest.' " *People v. Paskins*, 154 Ill. App. 3d 417, 422, 506 N.E.2d 1037 (1987), quoting *People v. Roberts*, 96 Ill. App. 3d 930, 933-34, 422 N.E.2d 154 (1981). Allowing police officers to restrain individuals during an investigatory stop recognizes the paradox that would occur if the police had the authority to detain an individual pursuant to a stop but were denied the ability to enforce or effectuate the stop. *People v. Walters*, 256 Ill. App. 3d 231, 237, 627 N.E.2d 1280

1-06-0432

(1994). Consequently, the status or nature of an investigatory stop is not affected by the drawing of a gun by a police officer (*People v. Moore*, 294 Ill. App. 3d 410, 415, 689 N.E.2d 1181 (1998)), by the use of handcuffs (*People v. Waddell*, 190 Ill. App. 3d 914, 926-27, 546 N.E.2d 1068 (1989)), or by placing an individual in a squad car (*Walters*, 256 Ill. App. 3d at 237, 627 N.E.2d 1280).

Lieutenant Schmitz testified that he learned from detectives in his division that family members of the victim had identified the offender as Carnell Moore, although they had not witnessed the crime. The victim's brother had told police that Carnell Moore had come looking for his brother three or four times in the days leading up to the incident; the last time with a two-by-four. Furthermore, Lieutenant Schmitz knew that two detectives had visited defendant's house the prior day and that someone had jumped out of a second-story window and run from the house. Lieutenant Schmitz also testified that he was aware that Sergeant Wojack had made several unsuccessful attempts to locate defendant. Lieutenant Schmitz received a phone call at approximately 7 p.m. the day after the incident from an unidentified caller who stated that defendant was sitting in a red Oldsmobile near the corners of Augusta Boulevard and Kostner Avenue. Shortly thereafter, Lieutenant Schmitz arrived at the area of Augusta and Kostner and saw a red Oldsmobile parked. Defendant's wife was in the driver's seat and defendant was in the passenger seat. These facts provided at least the minimal articulable suspicion required to stop defendant.

We now turn to the question of whether the restraint of defendant converted the investigatory stop into an arrest before probable cause existed. Defendant contends

8

that he was placed under arrest without probable cause when Lieutenant Schmitz ordered him in the back of squad car for interrogation. The State discounts defendant's argument and urges that the articulable suspicion needed to stop defendant ripened into probable cause when defendant confirmed his identity outside of the car.

Probable cause must exist to effect a valid, warrantless arrest. *Beck v. Ohio*, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225 (1964); *People v. Kidd*, 175 Ill. 2d 1, 22, 675 N.E.2d 910 (1996). Probable cause to arrest exists when the totality of the facts and circumstances within the officer's knowledge would lead a man of reasonable caution to believe that an offense has been committed and the person apprehended has committed the offense. *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317(1983). While the mere suspicion by an officer that the suspect is committing or has committed a crime is insufficient to establish probable cause, proof beyond a reasonable doubt is unnecessary. *People v. Sims,* 192 Ill. 2d 592, 614-15, 736 N.E.2d 1048 (2000). A determination of probable cause is governed by commonsense, practical considerations, and not by technical legal rules. *People v. Mitchell*, 45 Ill. 2d 148, 153-54, 258 N.E.2d 345 (1970).

The evidence in this case established that Lieutenant Schmitz knew that detectives in his division were investigating a homicide that had taken place the previous evening. Lieutenant Schmitz testified that he knew the victim's family members had identified defendant as the person who came looking for the victim three times prior to the victim's death. Lieutenant Schmitz was aware detectives had defendant's name, Carnell Moore, and his address, 1118 N. Latrobe. Lieutenant

9

Schmitz went to the location where he was told that he could find defendant. When he arrived, defendant's car was parked and defendant was sitting in the car. Officer Schmitz identified himself and defendant confirmed his identity as Carnell Moore. The totality of the facts and circumstances known to Lieutenant Schmitz at that time would lead a reasonable man to believe that Carnell Moore had beaten James McDonald to death. Therefore, Lieutenant Schmitz had probable cause to arrest defendant when defendant confirmed his identity. Although our holding differs from that of the trial court, we may affirm the holding of the trial court on any basis found in the record. *People v. Ward*, 371 Ill. App. 3d 382, 862 N.E.2d 1102 (2007). Accordingly, the trial court did not err in denying defendant's motion to quash and suppress.

Defendant makes much about the fact that Lieutenant Schmitz was not involved in the investigation of the beating death of James McDonald and did not have firsthand knowledge of the events leading to defendant being identified as the offender. Defendant claims that absent this particular knowledge, Lieutenant Schmitz could not have had sufficient probable cause to arrest him. Contrary to defendant's assertions, Illinois courts have held that " ' "[w]hen police officers are working in concert investigating a crime or possible crime, probable cause may be established from their collective knowledge, even if it is not within the personal knowledge of the arresting officer." ' " *People v. Walter*, 374 Ill. App. 3d 763, 775, 872 N.E.2d 104, 116 (2007), quoting *People v. Dizon*, 297 Ill. App. 3d 880, 885, 697 N.E.2d 780 (1998), quoting *People v. Hendricks*, 253 Ill. App. 3d 79, 89, 625 N.E.2d 304 (1993); see generally 2 W. LaFave, Search & Seizure §3.5(c), at 289-90 n.81 (4th ed. 2004). As previously

10

discussed, Lieutenant Schmitz may have not had personal knowledge of the investigation and identification of defendant as the offender, but he had been given sufficient information regarding the crime from fellow detectives. This information was certainly sufficient to establish probable cause to arrest defendant after defendant identified himself as Carnell Moore. Defendant's motion to quash arrest and suppress evidence was properly denied.

Defendant next argues that he was denied his right to confront witnesses against him when the court allowed Dr. Humilier to testify extensively at trial with respect to the findings of an autopsy performed by Dr. An, who had retired prior to trial in this case. Defendant notes that his right to confront the witnesses against him is protected by both the state (Ill. Const. 1970, art. I, §8) and federal (U.S. Const., amend. VI) constitutions. Relying on *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), defendant claims the autopsy report contained testimonial hearsay statements and Dr. An should have been subject to cross-examination. Defendant acknowledges that this issue was neither objected to at trial nor raised in his written posttrial motion and ordinarily would be waived, but he asks us to overlook these facts and urges us to consider this as plain error.

Supreme Court Rule 615(a) (134 Ill. 2d R 615(a)) states, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). In *People v. Herron*,

11

1-06-0432

215 Ill. 2d 167, 186-87, 830 N.E.2d 467 (2005), our supreme court clarified the plain error doctrine:

"we reiterate: the plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 186-87, 830 N.E.2d 467.

With these principles in mind, we must now determine whether error occurred.

The State argues that *Crawford* considerations implicate "testimonial" hearsay statements only. The State suggests that Dr. An's autopsy report was not testimonial because autopsy reports are business records and business records, consistent with *Crawford*, are not testimonial.

In *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the Supreme Court ruled that where "testimonial" hearsay is offered at trial, the right to confrontation by cross-examination is required in order to satisfy the

12

confrontation clause. While the *Crawford* court distinguished between testimonial and non-testimonial statements, it did not provide a comprehensive definition of "testimonial." The court did, however, conclude that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Despite this imprecise definition, the *Crawford* Court did expressly state that business records are, and historically have been, nontestimonal. *Crawford*, 541 U.S. at 56, 158 L. Ed. 2d at 195-96, 124 S. Ct. 1354.

We now turn to the next question: Is an autopsy report a business record? Section 115-5.1 of the Code of Criminal Procedure of 1963 states:

"In any civil or criminal action the records of the coroner's medical or laboratory examiner summarizing and detailing the performance of his or her official duties in performing medical examinations upon deceased persons or autopsies, or both, and *kept in the ordinary course of business* of the coroner's office, duly certified by the county coroner or chief supervisory coroner's pathologist or medical examiner, shall be received as competent evidence in any court of this State, to the extent permitted by this Section. These reports, specifically including but not limited to the pathologist's protocol, autopsy reports and toxicological reports, shall be public documents and thereby may be admissible as *prima facie* evidence of the facts, findings, opinions, diagnoses and conditions stated therein.

A duly certified coroner's protocol or autopsy report, or both, complying with the requirements of this Section may be duly admitted into evidence as an exception to the hearsay rule as *prima facie* proof of the cause of death of the person to whom it relates. The records referred to in this Section shall be limited to the records of the results of post-mortem examinations of the findings of autopsy and toxicological laboratory examinations." (Emphasis added.) 725 ILCS 5/115-5.1 (West 2002).

A plain reading of the statute governing the admissibility of the medical examiner's report as evidence leads us to conclude that an autopsy report should be treated as a business record. In addition, Illinois courts have held that autopsy reports are public records and business records. *Fatigato v. Village of Olympia Fields*, 281 Ill. App. 3d 347, 358, 666 N.E.2d 732 (1996); *Steward v. Crissell*, 289 Ill. App. 3d 66, 72, 681 N.E.2d 1040 (1997). Consequently, the autopsy report in the instant case did not implicate *Crawford* and defendant was not denied his sixth Amendment right to confrontation.

Given that no error occurred in this case, we need not continue our analysis of defendant's claim under the plain error doctrine.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

HOFFMAN, P.J., and SOUTH, J., concur.

14

1-06-0432

1-06-0432