# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Lee*, **2012 IL App (1st) 101851**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND LEE, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-10-1851 |
| Filed | April 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the successful prosecution of defendant for the killing of two elderly brothers in the course of a home invasion, the appellate court rejected defendant's contentions that the trial court erred in denying his motion to suppress his inculpatory statement and that he was denied his right to cross-examine the medical examiner who performed the autopsies, and pursuant to the one-act, one-crime rule, the appellate court corrected the mittimus to reflect two first-degree murder convictions, and one conviction each for arson, residential burglary, home invasion and robbery. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-3709; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

| | |
|---|---|
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Julianne Johnson, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter D. Fischer, and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. |
| | Presiding Justice Quinn and Justice Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a jury trial in the circuit court of Cook County, defendant Raymond Lee was convicted of first-degree murder, robbery, arson, home invasion and residential burglary. Subsequently, he was sentenced to natural life in prison for the murders, to be served concurrently with prison terms of 15 years for home invasion and residential burglary, and 7 years for robbery and arson. On direct appeal, the defendant argues that: (1) the trial court erred in denying his amended motion to suppress his inculpatory statement; (2) he was denied his constitutional right to confront and cross-examine the medical examiner who performed the victims' autopsies and authored the autopsy reports; and (3) under the one-act, one-crime rule, the mittimus should be corrected to reflect only two first-degree murder convictions, one arson conviction, one conviction for home invasion, and one conviction for robbery. For the following reasons, we affirm the judgment of the circuit court of Cook County, but order that the mittimus be corrected.

¶ 2                                    BACKGROUND

¶ 3      This case has an extensive factual background and only the most pertinent facts necessary to resolve the issues are included in this order. On January 3, 2000, elderly brothers Preston (Preston) and Raymond Stofer (Raymond) were robbed and beaten in their home at 1041 W. 112th Place in Chicago, Illinois, and subsequently killed when the home was set on fire. On January 4, 2000, at approximately 10:30 p.m., the defendant was arrested for the crime. On January 6, 2000, while in police custody, the defendant made inculpatory oral and videotaped statements to the police. On January 28, 2000, the defendant, along with codefendants John Mitchell (codefendant Mitchell) and Robert Campbell (codefendant Campbell), were charged with multiple counts of first-degree murder, home invasion, residential burglary, arson and robbery.

¶ 4      On October 31, 2000, the defendant filed motions to quash arrest (motion to quash) and to suppress his inculpatory statements (motion to suppress). On March 8, 2004, the trial

court[1] granted the motion to quash, finding that the police had lacked probable cause to arrest the defendant. Thereafter, the State filed a motion for attenuation, arguing that intervening probable cause existed shortly after the defendant's arrest and that his inculpatory statement was sufficiently attenuated from the illegal arrest. On January 5, 2005, at the attenuation hearing, the trial court ruled that the defendant's inculpatory statement was sufficiently attenuated from his illegal arrest. However, upon reconsideration on February 24, 2005, the trial court reversed its previous ruling on the motion for attenuation and found that no attenuation existed. On March 18, 2005, the State appealed the trial court's February 24, 2005 ruling, arguing that probable cause existed for the defendant's arrest. On October 17, 2006, in reversing the trial court's ruling, this court found that the defendant's arrest was supported by probable cause and remanded the matter for a hearing on the defendant's motion to suppress. *People v. Lee*, No. 1-05-0923 (Oct. 17, 2006) (unpublished order under Supreme Court Rule 23).

¶ 5 On remand, the defendant filed an amended motion to suppress statements (amended motion to suppress), alleging that his inculpatory statement was involuntary because it was obtained as a product of police coercion and in violation of his constitutional rights. On October 15, 2008, a hearing on the amended motion to suppress was held.[2] Sergeant Robert Larson (Sergeant Larson) testified on behalf of the State that on the evening of January 4, 2000, he located the defendant in the vicinity of 112th Place and Aberdeen Street and escorted him to the Area 2 police station. The defendant did not invoke his right to counsel at any time; however, Sergeant Larson stated that he did not advise the defendant of his *Miranda* rights nor question him regarding the crimes at issue during his contact with the defendant.

¶ 6 Detective Eileen Heffernan (Detective Heffernan) testified that she was assigned to investigate the murders of Preston and Raymond. On January 4, 2000, at approximately 11:30 p.m., she and her partner, Detective Michael Cummings (Detective Cummings), interviewed the defendant at the police station. Upon their arrival in the interview room, Detective Cummings advised the defendant of his *Miranda* rights, to which the defendant responded that he understood his rights and he agreed to speak with the detectives. During the 45-minute interview, the defendant provided the detectives with the following alibi: the defendant stated that he was at the victims' home at 10:45 a.m. on January 3, 2000, in order to collect money which Preston had owed him. Raymond informed the defendant at the time that Preston was not home, but that the defendant could return at about 12:30 p.m. The defendant then drove around in his car for awhile with codefendant Mitchell, smoked marijuana, and met up with codefendant Campbell and codefendant Campbell's girlfriend, Karen Blue (Karen). The four individuals then stopped at a gas station and later went to codefendant Campbell's house, where the defendant stayed until about 3 p.m. Detective Heffernan further testified that on January 5, 2000, at approximately 9 a.m., food was

---

[1]Judge Thomas R. Sumner presided over the cause of action at this time.

[2]Judge Joseph M. Claps presided over the cause of action upon remand as a result of Judge Thomas R. Sumner's retirement from the bench in December 2007.

brought to the defendant and she and Detective Cummings spoke with him for a few minutes in the interview room, during which they informed him that they would investigate his alibi. On January 6, 2000, at approximately 1 a.m., Detectives Heffernan and Cummings had another conversation with the defendant after he waived his *Miranda* rights. During this 30-minute interview, the detectives informed the defendant that several individuals had implicated him in the murders. At no time did the defendant ever invoke his right to counsel. Detective Heffernan denied that Detective Cummings ever physically struck the defendant or made any verbal threats against him in her presence. She denied ever taunting the defendant with the threat of the death penalty or telling him that he had "better not mess with Detective Cummings because he was crazy and would kill him." Detective Heffernan also denied seeing Detective Cummings walk back and forth during the interview with a weight-lifting belt and snapping it in front of the defendant, nor did Detective Cummings tell the defendant to "be smart" because this was a "double murder" for which he would receive the death penalty, but that "[i]t's okay if [he] just went in there to get [his] money and something happened that [he] didn't want to." The defendant never complained to Detective Heffernan or anyone else that he had been struck or mistreated by the police. He was not handcuffed at any time during the interviews.

¶ 7        Detective Cummings' testimony at the hearing on the amended motion to suppress was substantially similar to Detective Heffernan's testimony. Detective Cummings further testified that during the early evening of January 5, 2000, he introduced the defendant to Detective Graziano, who was also investigating the murders. At noon on January 6, 2000, Detective Cummings informed the defendant of the progress of the investigation, that codefendants Mitchell and Campbell had confessed to the crime and also implicated the defendant, and that Detective Cummings was going to gather evidence from the crime scene and a codefendant's home. Detective Cummings denied telling the defendant that a woman named Felicia had made a dying declaration which implicated the defendant in the double murder, and denied ever striking the defendant or having any physical contact with him. He further denied making any verbal threats against the defendant or referencing the death penalty during the interviews. Detective Cummings stated that the defendant neither invoked his right to remain silent nor requested the presence of an attorney at any time.

¶ 8        Retired detective Phillip Graziano (Detective Graziano) testified that he investigated the murders of Preston and Raymond in January 2000. On January 5, 2000, Detective Graziano was introduced to the defendant, who was not handcuffed and appeared physically and mentally well. Detective Cummings was present at the time and asked the defendant if he needed anything to eat or drink or to use the restroom. On January 6, 2000, at approximately 8 p.m., he and Detective Judge advised the defendant of his constitutional rights, which the defendant acknowledged he understood. Detective Graziano then told the defendant that he knew how and when the crime occurred. Detective Graziano then commented to the defendant that "isn't it better to be known as a liar and a thief than a killer of old men?" He further informed the defendant that he believed that Preston had gotten "the better of [the defendant]" during a physical altercation and that the defendant struck Preston's head with a steam iron from the dining room area. Detective Graziano also expressed his belief that the defendant had taken money from Preston's pocket. In response, the defendant stated that he

-4-

did not set the house on fire and made incriminating statements regarding the events of January 3, 2000. Detective Graziano denied making or seeing anyone make a promise to the defendant that he would only be charged with strong-arm robbery, which carried a seven-year sentence, if he confessed. During the entire 20 to 30 minutes of conversation, the defendant never asked to speak with an attorney. The defendant did not complain to Detective Graziano of any ill treatment by the police nor did Detective Graziano ever observe any police officers physically or verbally threaten the defendant.

¶ 9    Assistant State's Attorney George Canellis (ASA Canellis) testified that when he arrived at the police station on January 6, 2000, at approximately 10 p.m., the defendant appeared fine, had no complaints or visible physical injuries, and was not handcuffed. ASA Canellis advised the defendant of his *Miranda* rights, which the defendant acknowledged he understood and stated that he wished to speak with ASA Canellis. ASA Canellis then spoke with the defendant for about 30 to 40 minutes, during which the defendant made incriminating statements about the crime. At about 2:30 a.m. on January 7, 2000, ASA Canellis, in the presence of Detective Judge, offered the defendant a number of ways to memorialize his statement. The defendant chose to videotape his incriminating statement, at which point Detective Judge left the interview room and the defendant privately told ASA Canellis that he had been treated "okay" by the police, that he had been given food and drink, that he was giving the statement freely and voluntarily, and that no force was used to obtain his statement. The defendant also never informed ASA Canellis that any threats or promises were made by the police. The defendant then signed a videotape consent form and, at 4 a.m., made a videotaped statement regarding the events of the crime in the presence of ASA Canellis and Detective Judge. In the videotaped statements, the defendant reiterated that he had not been mistreated by the police and that he was giving the statement freely and voluntarily. ASA Canellis further testified that the defendant never invoked his right to counsel nor informed ASA Canellis that he had previously asked the police for an attorney. ASA Canellis noted that the defendant never told him that the police made any promises or threats to him; specifically, the defendant never mentioned that the police had promised a lesser charge of strong-arm robbery if he confessed.

¶ 10   The parties then stipulated that, if called to testify, Cermak Health Services medical intake paramedic Charles Spivey (Paramedic Spivey) would testify that on January 8, 2000, he examined the defendant and found no signs of physical injury, nor did the defendant complain of any injuries.

¶ 11   Defense presented the testimony of several witnesses. Terry Barnett (Terry) testified that on January 4, 2000, when the police arrested the defendant in front of Terry's home, the defendant told the police officers that "I don't want to say nothing, I want a lawyer."

¶ 12   Dedrick Scales (Scales) testified that on January 5, 2000, he went to the police station where he spoke with police officers regarding the offense at issue. Scales stated that he was repeatedly denied his requests for an attorney and that Detective Cummings threatened to charge him with murder if he did not tell the truth. The police officers never advised him of his constitutional rights. On cross-examination, Scales stated that an assistant State's Attorney had advised him of his *Miranda* rights, which he waived by agreeing to speak with her, and that he signed a handwritten statement. He also informed the assistant State's

Attorney that he was treated "fair" and "well" by the police.

¶ 13    Theodore Macklin (Macklin) testified that he voluntarily went to the police station on January 4, 2000, and spoke with Detective Cummings, who told Macklin that he was in trouble for murder. Detective Cummings slapped his face several times, causing Macklin to lose an earring, and pushed him out of his unlaced shoes. The police officers also failed to heed Macklin's requests for an attorney, but he was eventually able to confer with an attorney his mother had sent to the police station. Macklin stated that he was at the police station for three days and that the police gave him food that had been partially eaten and a soda that was already open. Macklin also voluntarily submitted to a lie detector test, but never informed the polygraph examiner, ASA Canellis or the grand jury that he was mistreated by the police. Rather, he indicated that he was treated "okay" by the police officers. Subsequently, Macklin's mother filed a complaint with the police department regarding his mistreatment by the police; however, Macklin later chose not to pursue the complaint.

¶ 14    The defendant testified that he was arrested on January 4, 2000, and that the arresting police officers mirandized him in the police car, at which time he invoked his right to remain silent and right to counsel. Upon his arrival at the police station, he was placed in an interview room for 30 minutes before Detectives Cummings and Heffernan appeared. The detectives never told the defendant that he was not obligated to speak with them, nor did they advise him of his rights to an attorney and to remain silent. When the defendant invoked his right to counsel, Detective Cummings began slapping his face and accusing the defendant of murder. Detective Heffernan also told the defendant that he was "going to get the death penalty for the murders. Your family is going to be *** watching it on TV. They're going to be picketing the County trying for [you] not to get the death penalty. Somebody else is going to be raising [your] son, and [your] best friend is going to be [expletive] [your] girl." On the next day, Detectives Cummings and Heffernan came into the interview room and tried to question the defendant, whose request for an attorney was again denied. At some point during the 30-minute encounter, Detective Cummings exited the interview room and the defendant observed him "snapping" a weight-lifting belt in an effort to intimidate the defendant. The defendant claimed that during his time in custody, Detective Cummings was "always slapping" him; however, he never reported the physical abuse to ASA Canellis or to Paramedic Spivey, and he never mentioned it in his videotaped statement. The defendant asserted that he eventually provided Detective Cummings with an alibi–namely, that he was at codefendant Campbell's house at the time of the murders. However, when the defendant later saw codefendant Campbell's mother, Pat Good (Pat), at the police station, he knew that his alibi was not working because Pat would tell the police that he had not in fact been at Pat's home with codefendant Campbell until 3 p.m. on the day of the murders. At some point, Detective Cummings also informed the defendant that codefendants Campbell and Mitchell had implicated the defendant in the crimes, and that Macklin had seen the defendant at the victims' home on the day of the murders and the defendant had threatened to burn the house down. The defendant testified that a detective asked him, "isn't it better to be known as a robber instead of a murderer?" and that the detectives informed him that, if he confessed, he would only be charged with robbery, which carried a maximum sentence of seven years. Subsequently, the defendant made incriminating statements to Detectives Judge and

Graziano. On January 6, 2000, the defendant made a videotaped statement, outside the presence of Detective Cummings, after ASA Canellis advised him of his constitutional rights. On cross-examination, the defendant testified that his videotaped statement was made freely and voluntarily, but that he had believed he was only confessing to robbery. He further testified that his decision to provide a videotaped statement was based entirely on the detectives' promise that he would only be charged with robbery.

¶ 15 On January 2, 2009, the trial court denied the defendant's amended motion to suppress, finding that, based on its observation of the defendant's demeanor, voice and "look in his eyes" on the videotape, the defendant's videotaped statement was made voluntarily. The trial court further found the defendant's testimony and allegations to be incredible, including his claims that he had invoked his right to counsel during the interviews and that he had only confessed as a result of the promise of a lesser charge. On February 20, 2009, at the hearing on the defendant's motion to reconsider the trial court's January 2, 2009 ruling, the trial court clarified that its conclusion regarding the voluntariness of the defendant's statement was based upon the totality of the circumstances. Subsequently, the trial court denied the defendant's motion to reconsider.

¶ 16 On May 11, 2010, a jury trial commenced during which evidence was presented to show that on January 3, 2000, at 1:25 p.m., firefighters were called to the victims' house, where they found the burned bodies of Preston and Raymond. Raymond's hands and feet were bound and his mouth was also gagged. A gasoline can and three cigarette lighters were found in the home. Fire investigators determined that gasoline had been poured on both of the victims' bodies, which were then ignited.

¶ 17 Medical Examiner Hillory McElligott (Dr. McElligott)[3] testified that the autopsies of Preston and Raymond were performed by Dr. Darinka Mileusnic (Dr. Mileusnic), who had moved to Tennessee by the time the case was tried. The autopsy reports showed that 68-year-old Raymond was severely burned and suffered hemorrhaging in his head and neck. The presence of soot and smoke in Raymond's lungs indicated that he was alive when the fire started. The autopsy reports showed that 66-year-old Preston was also severely burned and suffered bruises and lacerations on his face, a fractured nose, and hemorrhaging beneath his scalp and in his left ribs. Like Raymond, Preston was alive at the time of the fire because soot and smoke were found in his lungs. Based on Dr. McElligott's review of the autopsy reports, toxicology reports, photographs and X-rays, she agreed with Dr. Mileusnic's conclusion and opined to a reasonable degree of medical certainty that the cause of death for Raymond was strangulation, with inhalation injuries, thermal burns and blunt head trauma as significant factors contributing to his death. The cause of death for Preston was blunt head trauma, with inhalation injuries and thermal burns as significant contributing factors. The parties then stipulated that on January 4, 2000, Dr. Mileusnic performed the autopsies of Raymond and Preston and that she gave the physical evidence collected from the bodies to the Chicago police.

¶ 18 Scales testified at trial that at noon on January 3, 2000, he and Macklin drove Macklin's

---

[3]The spelling of Dr. McElligott's name varies in the record.

blue station wagon to Preston and Raymond's home in order to collect drug money that Preston had owed them. Scales and Macklin knew that Preston usually received a social security check on the third day of each month and that Preston's creditors got paid on a "first come, first served" basis. As Scales and Macklin began to leave after collecting money from Preston, they observed the defendant and codefendant Mitchell in a blue-green Bonneville parked in the alley. The defendant appeared upset when Scales and Macklin told him that they had already been paid by Preston. Thereafter, Scales and Macklin left in a separate direction from the defendant and codefendant Mitchell. Scales further testified that he was in police custody for over 72 hours in January 2000 and noticed that Macklin, who was also in custody at the same time, had swelling on his face.

¶ 19 Detective Graziano testified at trial that on January 6, 2000, the defendant, codefendants Campbell and Mitchell, Macklin and Scales were at the police station in five separate interview rooms. After speaking with codefendants Campbell and Mitchell, Detective Graziano went to codefendant Mitchell's home, where he recovered a white T-shirt and a pair of black gym shoes. He also retrieved a steam iron from the victims' home. At trial, Detective Graziano detailed the incriminating statements made by the defendant during the 8 p.m. interview on January 6, 2000.

¶ 20 Evidence was elicited at trial that blood stains found on the defendant's shoes matched Preston's DNA profile, while bloodstains on the T-shirt recovered by the police matched the defendant's DNA profile.

¶ 21 ASA Canellis' testimony at trial regarding his interviews with the defendant was substantially similar to his testimony at the hearing on the amended motion to suppress. However, ASA Canellis acknowledged that he never asked the defendant in the video recording about whether any promises had been made to obtain his confession. At trial, the videotaped statement was published to the jury. In the videotaped statement, the defendant described how he and codefendant Mitchell broke into the victims' home while armed with a can of gasoline in order to collect drug money that Preston had owed the defendant. He stated that codefendant Mitchell duct taped Raymond's mouth and bound his hands and feet, while the defendant engaged in a physical altercation with Preston. The defendant demonstrated in the videotaped statement how he beat Preston with an iron. After fighting with Preston, he rummaged through Preston's pockets and dresser to retrieve between $8 to $10. Codefendant Mitchell then poured gasoline on the victims and ignited the house. Thereafter, the defendant, codefendant Mitchell and codefendant Campbell, who was waiting in a getaway car, fled to codefendant Campbell's home, where the defendant changed clothes.

¶ 22 Subsequently, the jury convicted the defendant of first-degree murder, robbery, arson, residential burglary and home invasion. On June 11, 2010, the defendant filed a motion for a new trial, which was denied on June 17, 2010. Thereafter, the defendant was sentenced to a mandatory life sentence for the murders, to be served concurrently with prison terms of 15 years for home invasion and residential burglary, and 7 years for robbery and arson. On June 17, 2010, a notice of appeal was filed before this court.

¶ 23                                    ANALYSIS

¶ 24      We determine the following issues: (1) whether the trial court erred in denying the defendant's amended motion to suppress his incriminating statement; (2) whether the defendant was denied his constitutional right to confront and cross-examine the medical examiner who performed the victims' autopsies and authored the autopsy reports; and (3) whether under the one-act, one-crime rule, the mittimus should be corrected to reflect only two first-degree murder convictions, one arson conviction, one conviction for home invasion, and one conviction for robbery.

¶ 25      First, we determine whether the trial court erred in denying the defendant's amended motion to suppress his incriminating statement. In examining this issue, we give great deference to factual findings by the trial court and will only reverse such findings if they are against the manifest weight of the evidence. *People v. Rivera*, 409 Ill. App. 3d 122, 130, 947 N.E.2d 819, 829 (2011). However, the trial court's legal determination of whether suppression is warranted under these facts is reviewed *de novo*. *Id.* A reviewing court may consider evidence presented both at trial and at the pretrial hearing in determining whether the trial court erred in denying a motion to suppress. *People v. Harris*, 389 Ill. App. 3d 107, 118, 904 N.E.2d 1077, 1087 (2009). "Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence." *People v. Polk*, 407 Ill. App. 3d 80, 92, 942 N.E.2d 44, 55 (2010).

¶ 26      The defendant argues that the trial court erred in denying his amended motion to suppress because the promise of leniency and the physical abuse by the police, the duration of his detention, and his invocation of the right to remain silent and right to counsel rendered his incriminating statement involuntary.

¶ 27      The State counters that the trial court correctly denied the defendant's amended motion to suppress his voluntary confession because the evidence supports the conclusions that the defendant never invoked his rights to silence and to counsel and that the detectives did not physically abuse him or make false promises of leniency in exchange for his incriminating statement. Further, the State points out that the trial court specifically found the defendant's testimony to be incredible, which should be afforded great deference on appeal.

¶ 28      The test for voluntariness of a confession is "whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he *** confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500, 670 N.E.2d 606, 613 (1996). Whether a statement is voluntarily given depends upon the totality of the circumstances. *Id.* Factors to consider in determining the voluntariness of a statement include "the age, education and intelligence of the accused; the length of the detention and the duration of the questioning; previous experience with the criminal justice system; falsely aroused sympathy; offers of leniency or other promises to induce a confession; whether the accused was advised of his constitutional rights; and whether the accused was subjected to any physical mistreatment." *People v. Ball*, 322 Ill. App. 3d 521, 531-32, 750 N.E.2d 719, 727 (2001).

¶ 29      We first address the defendant's claims regarding the invocation of his rights to silence

and to counsel. In the present case, Sergeant Larson's testimony reveals that the defendant did not invoke his right to counsel at any time during his arrest. Detectives Heffernan and Cummings testified that on January 4, 2000, at approximately 11:30 p.m., the defendant agreed to speak with them after waiving his *Miranda* rights and provided the detectives with an alibi of his whereabouts at the time of the murders. Likewise, they testified that at 1 a.m. on January 6, 2000, the defendant again agreed to speak with them after waiving his rights. They noted that the defendant neither invoked his right to remain silent nor requested the presence of an attorney at any time. Detective Graziano also testified that during his 20 to 30 minutes of conversation with the defendant at 8 p.m. on January 6, 2000, the defendant was advised of his *Miranda* rights, which he indicated he understood, and proceeded to tell Detectives Graziano and Judge that he did not set the house on fire. The record also indicates that ASA Canellis advised the defendant of his rights during his interview at about 10 p.m. on January 6, 2000, and that the defendant acknowledged he understood those rights and waived them by giving incriminating statements about the murders. ASA Canellis further testified that the defendant never invoked his right to counsel nor informed ASA Canellis that he had previously asked the police for an attorney. Our review of the videotaped statement shows that the defendant was again advised of his *Miranda* rights and opted to speak with ASA Canellis. Thus, we find that the evidence supports the conclusion that the defendant did not unambiguously invoke his rights to silence and to counsel. See *Polk*, 407 Ill. App. 3d at 94-97, 942 N.E.2d at 57-58 (requests for counsel and to remain silent must be unambiguous or unequivocal).

¶ 30 While the defendant's version of what took place at the time of his arrest and custodial interrogations differed significantly from the testimony of the detectives and ASA Canellis, it is the function of the trial court to determine the credibility of the testifying witnesses and to resolve any conflict in their testimony. See *People v. Buie*, 238 Ill. App. 3d 260, 269, 606 N.E.2d 279, 284 (1992) ("[t]estimonial conflicts must be resolved by the trier of fact based upon the credibility of the witnesses"). In denying suppression of the incriminating statement, the trial court found the defendant's testimony and allegations to be incredible, and stated that based on the defendant's demeanor, voice and "look in his eyes" in the videotaped statement, the incriminating statement was made voluntarily. Although the defendant testified that he invoked his rights to silence and to counsel upon arrest, and that his repeated requests for an attorney during custodial interrogations were denied, we decline the defendant's invitation to substitute our judgment for that of the trier of fact. Moreover, even assuming the defendant had invoked his rights in the presence of the arresting police officers by stating, "I don't want to say nothing, I want a lawyer," there is no evidence in the record to show that the arresting police officers questioned the defendant about the murders en route to the police station. Further, we find that such a statement had no bearing on whether the defendant later waived his constitutional rights at the police station when given a fresh set of *Miranda* warnings during each interview session.

¶ 31 For the same reasons, we find that the evidence supports the conclusion that the defendant's incriminating statement was not rendered involuntary as a result of physical and psychological coercion by the police. The defendant claims that Detective Cummings repeatedly slapped him and snapped a weight-lifting belt to intimidate him while he was in

police custody, which he asserts was supported by the testimony of Macklin and Scales.

¶ 32     We find that the defendant's allegations of physical coercion centered solely on *his* version of what occurred. However, the record reveals that the police detectives denied ever striking or observing anyone strike the defendant during his time in custody, nor did they see Detective Cummings snap a weight-lifting belt to intimidate the defendant. There is also evidence that the defendant was never handcuffed during the interview sessions, that he appeared physically and mentally well, and that he never complained to ASA Canellis or any other police detectives that he had been mistreated. The trial court heard the testimony of Detectives Heffernan and Cummings, who denied taunting the defendant with the threat of the death penalty. Evidence also shows that the defendant privately told ASA Canellis that he had been treated "okay" by the police, that he had been given food and drink, that he was giving the incriminating statement freely and voluntarily, and that no force was used to obtain his confession. The defendant also never informed ASA Canellis that any threats or promises were made by the police. The stipulated testimony of Paramedic Spivey, who examined the defendant, stated that the physical examination revealed no signs of injury. While there is some indication in Macklin's and Scales' testimony that they were mistreated by the police detectives during their time in custody, we find that Scales and Macklin provided no firsthand information about the defendant's custodial interrogations. As noted, credibility determinations are within the province of the trier of fact, and we will not reweigh the evidence or substitute our judgment for that of the trial court where conflicting testimony exists. Therefore, we find that the evidence supports the conclusion that the defendant's incriminating statement was not a product of physical or psychological coercion by the police.

¶ 33     The defendant further argues that he was induced to make an incriminating statement when Detective Graziano told him that he would only be charged with strong-arm robbery and sentenced to no more than seven years in prison if he confessed. Specifically, he contends that this false promise of leniency was "the only reason that [he] made an inculpatory statement for the first time."

¶ 34     "To constitute a promise of leniency, the statement must be coupled with a suggestion of a specific benefit that will follow if defendant confesses." *People v. Johnson*, 285 Ill. App. 3d 802, 808, 674 N.E.2d 844, 848 (1996). However, a confession is not *per se* inadmissible even where promises or suggestions of leniency have been made. *Id.* at 807-08, 674 N.E.2d at 847-48.

¶ 35     In the present case, the trial court heard conflicting testimony regarding whether the defendant was promised a lesser charge of strong-arm robbery in exchange for his incriminating statement. The defendant testified that the detectives informed him that, if he confessed, he would only be charged with strong-arm robbery, which carried a maximum sentence of seven years, and that he believed he was only confessing to robbery. However, testimonial evidence also shows that Detective Graziano denied making or seeing anyone make a promise of a lesser charge to the defendant during his time in police custody. At the beginning of the videotaped statement, ASA Canellis expressly noted that they were there to investigate a homicide. While ASA Canellis acknowledged that he never asked the defendant during the video recording about whether any promises had been made to obtain

-11-

his confession, ASA Canellis testified that the defendant was given the opportunity to speak with him alone but that the defendant never informed him of any threats or promises made by the police. Further, in his videotaped statement, the defendant demonstrated how he used the steam iron to beat Preston. The autopsy revealed that one of Preston's eyes was torn by a blow and one of the causes of his death was blunt trauma to the head. These facts contradict the defendant's argument that he thought he was only admitting to committing a strong-arm robbery. The trial court, which had the opportunity to observe the witnesses, weighed the evidence presented before it, determined the credibility of the witnesses, and found the defendant's allegation regarding a promise of leniency to be incredible. Thus, we defer to the trial court's findings, which were supported by the record. Therefore, we find the cases cited by the defendant in support of his contention to be distinguishable, where the manifest evidence in those cases prompted the trial court to suppress the defendant's incriminating statements. See *People v. Arkebauer*, 198 Ill. App. 3d 470, 555 N.E.2d 1162 (1990); *People v. Shaw*, 180 Ill. App. 3d 1091, 536 N.E.2d 849 (1989); *People v. Ruegger*, 32 Ill. App. 3d 765, 336 N.E.2d 50 (1975). Unlike those cases, here, the trial court did not find that the police made a promise of leniency to the defendant, much less that the defendant was somehow overcome by that promise in making the incriminating statement.

¶ 36    While it is established that Detective Graziano made a comment to the defendant to the effect that "isn't it better to be known as a robber instead of a murderer of old men?" we find that this statement did not constitute a promise of leniency because it lacked any suggestion of a specific benefit that would ensue from the defendant's confession.

¶ 37    After reviewing the totality of the circumstances surrounding the defendant's incriminating statement, we find that the trial court's determination of voluntariness was not against the manifest weight of the evidence. There was evidence that *Miranda* warnings were given multiple times prior to his videotaped statement to ASA Canellis; that the various interview sessions were relatively brief–without exceeding at maximum 45 minutes of police interrogation–and sufficiently punctuated by long periods of time in between sessions; that the defendant was 21 years of age and had obtained his GED at the time of his arrest; that he had previous experience with the criminal justice system; and that he was not physically or psychologically coerced by the police into making a statement. While the defendant had been detained for about 46 hours at the time he began making incriminating statements to the police, we find that the time in custody alone did not render his statement involuntary. See *Gilliam*, 172 Ill. 2d at 500, 670 N.E.2d at 614 (no single factor in the test for voluntariness of a confession is dispositive). Accordingly, we cannot say that the trial court's findings were against the manifest weight of the evidence; thus, the trial court properly denied the defendant's amended motion to suppress.

¶ 38    We next determine whether the defendant was denied his constitutional right to confront and cross-examine the medical examiner who performed the victims' autopsies and authored the autopsy reports.

¶ 39    The defendant argues that although Dr. McElligott testified at trial regarding the autopsy findings, the autopsy reports were testimonial hearsay and he was denied his opportunity to confront and cross-examine Dr. Mileusnic, who performed the autopsies and authored the reports. The defendant acknowledges that this issue was not raised in the trial court and

-12-

ordinarily would be forfeited, but he urges this court to consider the issue under plain error.

¶ 40     The State counters that the defendant forfeited appellate review of this issue because he did not file a motion *in limine* to exclude Dr. McElligott's testimony, did not object at trial, and did not challenge her testimony in a posttrial motion. Further, it argues that the issue could not be reviewed under the plain error doctrine because error could not be established. The State maintains that Dr. McElligott testified at trial and gave her own independent opinion about the victims' causes of death after reviewing Dr. Mileusnic's prepared autopsy reports and that the defendant's constitutional right to confront and cross-examine was not implicated because the autopsy reports were admissible as nontestimonial business records.

¶ 41     We find that the defendant forfeited review of this issue on appeal because he raised the issue in neither the trial court nor in his motion for a new trial. See *People v. Herron*, 215 Ill. 2d 167, 175, 830 N.E.2d 467, 472-73 (2005) (a defendant who fails to make a timely trial objection and include the issue in a posttrial motion forfeits the review of the issue). However, the plain error doctrine allows a reviewing court to consider unpreserved issues when either: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is so serious, regardless of the closeness of the evidence. *Herron*, 215 Ill. 2d at 178-79, 830 N.E.2d at 475; *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). The first step in a plain error analysis is to determine whether an error occurred at all. *People v. Hudson*, 228 Ill. 2d 181, 191, 886 N.E.2d 964, 971 (2008).

¶ 42     The sixth amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. "This part of the sixth amendment is called the confrontation clause and applies to the states through the fourteenth amendment." *People v. Williams*, 238 Ill. 2d 125, 142, 939 N.E.2d 268, 277 (2010), *cert. granted*, ___ U.S. ___, 131 S. Ct. 3090 (June 28, 2011). The sixth amendment's primary object concerns "testimonial hearsay." *Id.* Testimonial statements made by a witness absent from trial may only be admitted where the declarant is unavailable and the defendant has had a prior opportunity to cross-examine him. *Id.*; see *Crawford v. Washington*, 541 U.S. 36 (2004). However, "the confrontation clause does not bar the admission of testimonial statements that are admitted for purposes other than proving the truth of the matter asserted." *Williams*, 238 Ill. 2d at 142, 939 N.E.2d at 277.

¶ 43     In the instant case, Dr. Mileusnic, who had moved to Tennessee and did not testify at trial, had performed the autopsies of Preston and Raymond and prepared the autopsy reports. At trial, Dr. McElligott testified that based on her review of the autopsy reports, toxicology reports, photographs and X-rays, she agreed with Dr. Mileusnic's conclusion and opined to a reasonable degree of medical certainty as to the causes of death for the victims.

¶ 44     Illinois courts have repeatedly addressed this issue. In *People v. Moore*, 378 Ill. App. 3d 41, 880 N.E.2d 229 (2007), the defendant, as in the instant case, argued that he was denied his right to confront witnesses against him when the trial court allowed a medical examiner to testify to the findings of an autopsy performed by a nontestifying medical examiner, who had retired prior to the trial. *Id.* at 49, 880 N.E.2d at 235. In rejecting the defendant's argument, the *Moore* court held that autopsy reports fall within the business record exception

rule against hearsay and, thus, were not testimonial in nature so as to implicate the defendant's right of confrontation under *Crawford*. *Id.* at 50-51, 880 N.E.2d at 237.

¶ 45 Likewise, in *People v. Leach*, 405 Ill. App. 3d 297, 939 N.E.2d 537 (2010), *appeal allowed*, 239 Ill. 2d 572, 943 N.E.2d 1105 (2011) (table), this court found that a medical examiner's testimony regarding the findings of an autopsy performed by a nontestifying medical examiner was not testimonial hearsay, and the admission of the autopsy report was a public record that did not violate the defendant's confrontation right. *Id.* at 306-08, 939 N.E.2d at 546-47 (citing 725 ILCS 5/115-501 (West 2002)). The *Leach* court further held that autopsy reports are not manufactured for the benefit of the prosecution and, thus, cannot be considered testimonial in nature. *Id.* at 308, 939 N.E.2d at 547. Moreover, the *Leach* court noted that even assuming that the testifying medical examiner's observations and findings at trial were testimonial, the data compiled by the nontestifying medical examiner was not admitted for the purpose of proving the truth of his findings at trial because it only served as a basis upon which the testifying medical examiner rendered her ultimate conclusion. *Id.* at 310-11, 939 N.E.2d at 549.

¶ 46 Applying the principles of *Moore* and *Leach*, we find that Dr. McElligott's testimony regarding the findings of the autopsy reports was not testimonial in nature, that the autopsy reports fell within the business records exception to hearsay, and thus, the defendant's right to confrontation was not implicated under *Crawford*. Moreover, we note that even assuming *argeundo* that Dr. McElligott's observations and findings at trial were testimonial in nature, the autopsy reports were not admitted for the purpose of proving the truth of Dr. Mileusnic's findings because it, along with the toxicology reports, photographs and X-rays, only served as a basis upon which Dr. McElligott formed her own opinion as to the causes of death of the victims. Thus, we find that the defendant's right to confront and cross-examine Dr. Mileusnic was not violated.

¶ 47 In so holding, we are mindful of the defendant's arguments urging this court to decline to follow *Moore* and *Leach* and, instead, to follow *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705 (2011). We decline the defendant's invitation to deviate from the holdings of *Moore* and *Leach* and further find *Bullcoming* to be factually distinguishable from the instant case, where, in *Bullcoming*, the "surrogate" testimony of a forensic analyst in introducing a blood-alcohol analysis report, which was certified by a nontestifying forensic analyst, violated the confrontation clause because the testifying forensic analyst had not certified the report and the contents of the report were principal evidence for proving a factual question against the defendant for aggravated driving while under the influence of intoxicating liquor (DWI). *Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2709-17. Unlike *Bullcoming*, the autopsies here were not performed and the autopsy reports were not made solely for the primary purpose of aiding a police investigation, and, as it is undisputed that the manner of the victims' deaths was homicide, the exact causes of the victims' deaths had no direct bearing on the essential elements of the crimes at issue, the identity of the perpetrators, or the fact that the perpetrators had broken into the victims' home and set it on fire. Therefore, the defendant has not established that any error occurred, and we need not continue our analysis of the defendant's claim under the plain error doctrine.

¶ 48 We next determine whether under the one-act, one-crime rule, the mittimus should be

corrected to reflect only two first-degree murder convictions, one arson conviction, one conviction for home invasion, and one conviction for robbery. While the defendant failed to challenge this issue in the trial court, our supreme court has held that " 'an alleged one-act, one-crime violation and the potential for a surplus conviction and sentence affects the integrity of the judicial process' " and may be reviewed under plain error. *People v. Artis*, 232 Ill. 2d 156, 167-68, 902 N.E.2d 677, 684 (2009) (quoting *People v. Harvey*, 211 Ill. 2d 368, 389, 813 N.E.2d 181, 194 (2004)). Thus, we review this issue despite forfeiture.

¶ 49    In the present case, the defendant was convicted of 12 counts of first-degree murder, 2 counts of home invasion, 5 counts of residential burglary, 2 counts of arson, and 1 count of robbery. The trial court sentenced the defendant to a mandatory natural life in prison for the murders, to be served concurrently with prison terms of 15 years for home invasion and residential burglary, and 7 years for robbery and arson.

¶ 50    The defendant argues, and the State concedes, that under the one-act, one-crime rule, the mittimus should be corrected to reflect the conviction of 2, rather than 12, counts of first-degree murder because there were only two decedents in this case and only the most serious murder offense–intentional murder (counts I and III)–should stand. See *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844 (1977) (one-act, one-crime rule prohibits multiple convictions where the convictions have been carved from the same physical act); *People v. Rodriguez*, 336 Ill. App. 3d 1, 13, 782 N.E.2d 718, 727-28 (2002) (where multiple convictions for murder are obtained for offenses arising out of a single act, only the conviction and sentence for the most serious murder charge will be upheld). Based on our review of the record, we agree with the parties' contention that the convictions for intentional murder (counts I and III) should stand, and that the convictions on the less serious charges of murder–felony murder and "strong probability" murder–should be vacated. Therefore, we order that the mittimus be corrected to reflect the convictions and mandatory life sentences for intentional murder (counts I and III), but vacate the convictions for felony murder and "strong probability" murder (counts II, IV to VI, IX to XII, XVII to XVIII).

¶ 51    The defendant also argues, and the State concedes, that one of his two arson convictions (counts XLVII and XLVIII) should be vacated because they were based on the same physical act of damaging the victims' home with fire and, thus, violates the one-act, one-crime rule. We agree and order that the mittmus be corrected to reflect only one conviction for arson and one seven-year sentence for arson.

¶ 52    The defendant also challenges his five residential burglary convictions (counts XL to XLIV) and two home invasion convictions (counts XXI and XXII), arguing that all five residential burglary convictions, one home invasion conviction, and their respective sentences should be vacated because they were predicated upon the same physical act of the defendant's unauthorized entry into the victims' dwelling place. Because residential burglary was a lesser-included offense of home invasion, the defendant asserts that all five residential burglary convictions should be vacated, along with one of the home invasion convictions, under the one-act, one-crime rule.

¶ 53    The State agrees that one of the home invasion convictions and ensuing sentence should be vacated, but argues that one of the convictions for residential burglary should remain

because the offenses of residential burglary and home invasion required proof of different elements. Specifically, the State argues that for home invasion, it was required to prove that the defendant committed the additional act of intentionally injuring Raymond and Preston after entering their home.

¶ 54       We agree with the State and find that the offenses of residential burglary and home invasion required proof of different elements, and thus, one conviction for residential burglary and one conviction for home invasion will stand. The charges for residential burglary in the indictment against the defendant required the State to prove that he knowingly and without authority entered the victims' dwelling place with the intent of committing robbery, theft, or arson. However, the charges for home invasion, as set forth in the indictment, required the State to prove that the defendant committed the additional act of intentionally injuring Preston and Raymond in their home. Therefore, we find that the convictions for residential burglary and home invasion were not predicated upon the same physical act under the one-act, one-crime rule. See *People v. Price*, 2011 IL App (4th) 100311 (distinguishing *People v. McLaurin*, 184 Ill. 2d 58, 703 N.E.2d 11 (1998)), and finding that convictions for home invasion and residential burglary were not carved out of the same physical act where they shared only the act of entry and home invasion required the additional act of causing injury to a resident). Further, we find that the five residential burglary convictions are duplicative of the same physical act of the defendant's unlawful and unauthorized entry into the victims' home, and thus, only one conviction for residential burglary should stand. Likewise, the two convictions for home invasion are duplicative of the same physical act of the defendant's unauthorized entry into the victims' home and his intentional injury of the victims. Thus, we order the mittimus to be corrected to reflect one conviction for residential burglary and one conviction for home invasion.[4]

¶ 55       Accordingly, for the foregoing reasons, we: (1) affirm the defendant's conviction and sentence for intentional first-degree murder (counts I and III); (2) affirm the defendant's conviction and sentence for robbery; (3) vacate the convictions for felony murder and "strong probability" murder (counts II, IV to VI, IX to XII, XVII to XVIII); (4) vacate one conviction and one 7-year sentence for arson; (5) vacate four convictions and four 15-year sentences for residential burglary; (6) vacate one conviction and one 15-year sentence for home invasion; and (7) order the mittimus corrected to reflect only two intentional first-degree murder convictions (counts I and III) and their resultant sentences; one conviction and sentence for arson; one conviction and sentence for residential burglary, one conviction and sentence for home invasion, and one conviction and sentence for robbery. See *People v. Hill*, 402 Ill. App. 3d 920, 929, 932 N.E.2d 173, 182 (2010) (a reviewing court may correct the mittimus without remanding the cause to the trial court); see generally Illinois Supreme Court Rule 615(b)(1) (a reviewing court may modify the judgment or order from which the appeal is taken).

---

[4]We further note that the defendant does not challenge his conviction for robbery (count XLIV).

¶ 56   Affirmed; mittimus corrected.